Good morning, Your Honors. Opposing counsel, may it please the Court. My name is Andrew Barr. I represent the petitioner in this case, Ms. Mia Andrade, a transgender woman and transgender human rights defender from Honduras. Your Honors, before we address the numerous issues with the agency's decisions and the significant problems I have with the government's argument on appeal, I do think it's helpful to reorient the Court about the ultimate issue that was before the agency and the ultimate issue before this Court. And that's whether Ms. Andrade demonstrated a 10% likelihood of persecution on account of her status as a transgender woman and a transgender human rights defender if she's returned to Honduras. There is no nothing that explains the lifetime of systematic abuse and violence she endured other than her status as a transgender woman. If we look to the specific findings of the agency, I'd say the most palpable error is the lack of a finding of past persecution. Ms. Andrade showed four different particularized classes of persecution that she endured. And if we look at the three-factor test that the agency and this Court looks to for past persecution, it couldn't be any more clear that there's outright legal error here. Could you please detail which acts visited upon the petitioner you suggest fit the meaning of persecution under the act? Yes, Your Honor. Past persecution. Correct. And, you know, just to orient the Court, we're looking at accumulative harm here, but for specific acts, if we want to focus just on the police, I think the police is- The police. That's correct. What do the police do and when to her? So if we focus on the record between pages 143 and 158, Ms. Andrade says, and I'm quoting, because of my gender, I suffered harm from the police. What harm? The first harm we'll focus on is the transgender rights march. She is in a transgender rights march that she is leading that the police use tear gas to, tear gas and violence to disrupt. She ultimately has her arm dislocated simply because they want to break up this transgender rights march. Now, the government will tell you, and what the IJ said, which I note is pure conjecture, is that it was some type of crowd control effort by the police. But in the transcript, and it's page 146 of the record, the IJ actually asked Ms. Andrade, quote, was the march out of hand? Her response, no. If the march isn't out of hand, even if we assume the police had some legitimate reason to stop the march, there is absolutely no And just to remind the court, we're not talking about the only reason this transgender rights march was broken up. All we have to show is it was one central reason that she suffered this persecution was her status as a transgender woman. It's impossible to understand this record and ignore the fact of her transgender status and the way that they broke up this march. Okay, so that's the first episode. That's correct. With the police. There's another episode with the police? That's correct. So separate and apart from the transgender march, and separate and apart from the general harm that she outlines from the police, there's a specific instance where the police go into what she calls a gross search, where they end up ultimately tasing her and robbing her. Now, the government's response and the agency's opinion says, well, she spoke, she essentially spoke up. And I think what the agency is ultimately saying is she asked for it. But that clearly isn't the law in this court. If we look at the Chand decision. How did she respond? I'm sorry. Why were they having contact with her on that occasion? According to her testimony, the police were carrying out a search with a search warrant looking for weapons, but they only targeted the trans women prostitutes who are in the area. Okay, so I'm trying to make sure I want to make sure that I'm remembering the same incident. I think the same is this second incident, the incident where she was working as a sex worker in an area and they came to the police came to that area. Is that right? That's correct. Okay, so is this the same incident where they removed her wig? It is. Okay, so can you tell me about that? Because there's an allegation in the briefing a couple of different places that she was sexually assaulted. And it may even use the word rape. And I don't I think it uses that word. And I'm trying to figure out where did that happen? Yes, Your Honor. So that's actually talked about in a different part of her testimony. It's actually a separate incident altogether. A separate instance? That's correct. This is just so you know, I know sometimes, you know, the case is so well that you forget what you've told us. But this separate instance, if it's separate, it's this is very unclear in the briefing. Okay. Okay. So she has two specific instances, the transgender rights march. Right. And the gross search where she was tased. Okay. And so a rape isn't included as a separate? Isn't that a third? Well, she doesn't outline a specific instance where it happens. The way that she describes it in the testimony, and it is very unclear. She was pro se at the hearing. And as you're aware, we don't think the testimony was elicited in a proper way. So you're not relying on that today? I really am trying to get my arms around everything you got. And it sounds like you're not relying on that. Is that right? No, that's that's not correct. We are certainly relying on its cumulative approach here. But we don't have specific details about that particular instance. What we do know is oftentimes when she was in her sex work, that her clients were the police. She calls them public officials and other. She also calls them the police. Right. And so your time is ticking. So I'm aware of that, that she worked as a sex worker and she alleges that she had death threats from the police that if she were to tell, they would potentially take her life. That's correct. But the argument from the government to see if a chance to respond is going to be nexus. It's going to be that that those death threats are the result of her work and not her status as a transgender person. So do you want to respond now that I do, Your Honor? And I would direct the court to the record at 365 and 377 to talk about those instances. But Your Honor, what it's it wouldn't be a credible argument for the government to make to somehow separate her transgender status and her work as a sex worker. The DHS guidance that is given, and I'm not suggesting it's binding on this court, but the DHS guidance for these particular claims are very clear that once you have a transgender woman who's evicted from her home, she has no option but to become a sex worker. That is the DHS. Where do I go for support for that? She worked in a grocery store and lost her, that's one of the other bases, and lost her job in the grocery store. But I didn't see that she tried to get other employment. If she had to work as a sex worker, if you can show me that, and then suffered death threats as a result, that seems to be much more compelling. But I'm missing the link that required her to work as a sex worker. Your Honor, this is a quote from the DHS guidance section 4.1 we cited in our briefing. Quote, transgender people face such severe discrimination that the only way they can survive is by engaging in prostitution. Okay, so where do I find that in the record, ER? DHS, it's not in the record, it's in a citation. This is a document DHS provides to its asylum officers. Okay. Section 4.1. DHS section what, 4.1? That's correct. Okay, thank you. It's cited throughout both of our briefs. Well, I don't want to take your time. I'll ask my follow-up questions of opposing counsel. Well, I'm going to the same argument you're referring to, Your Honor. If we look at the actual record itself, the things that were before the agency, she says that, and this is her word, she was forced into slavery because of the prostitution. Under this Court's standard, if you're put in a, quote, substantial economic disadvantage, or if this economic disadvantage is, quote, so severe that it constitutes a threat to an individual's life or freedom, that is persecution. So what I'm trying to get at, I think I do have to circle back, because this, the document that you're talking about, which is cited, you know, I appreciate that. But in this particular case, she did have other work. She worked in a grocery store. So that's the link I'm having trouble with. Is it the case that that's because they didn't know she was transgender? Or once they discovered it, she was fired? Or how do you get past this? Yes, Your Honor. So she worked, so as soon as she was evicted from her family home because she came out as transgender, she moves to the Capitol. She then becomes a worker at a supermarket. This is record 150 and 164. She is fired, and I'm using the words that I got my own, because she was, quote, a faggot, and because the supermarket was afraid that she was going to give them HIV. That is the reason she was fired. She then tried to go get a government course for some type of learning. I think it was in the accounting realm. And she was not permitted to take the class because she wouldn't dress like a woman. That's at record 151. So she's tried to go get a job. She can't get gainful employment. She tries to get higher education. She can't take any classes. So then she says she has no choice but to enter into the, quote, slavery of prostitution. Pardon me, counsel. Something sounded inconsistent to me. She didn't get into the course because she wouldn't dress as a woman, and she's claiming to be a transgender? I may have misspoken. She would not dress like a man. The language is she would not dress like a man, and that was the issue that she had. That's inconsistent with the story. Correct. No, this is all very consistent. I may have spoken inconsistently. But the herself. She tries to get, we'll call it legitimate employment for purposes of the argument. She can't maintain it as soon as they find out she's transgender. She tries to go do higher education. She's not able to get higher education because she's transgender. And then she's forced into the world of prostitution, which is entirely consistent with the documentary evidence that the agency did not look at, and entirely consistent with the DHS guidance for these particular types of claims. She has no issue. She has absolutely no chance of getting a house, no chance of getting food until she does the sex work. That is her testimony. So then she enters the sex work. It's remarkably violent. She's being raped. She's being robbed. She has death threats. And there's no way for her to hide this because she's gender nonconforming. Everyone who sees her on the street knows right off the bat that she's a transgender woman. So all of that is sort of the windup to the ultimate issue here was that anything she does, everybody knows she's transgender and nobody in Honduras has any interest in protecting her. Can you go back just quickly? Your time is ticking. I don't want to take a lot of your time, but you said there are four instances you're relying on. Yes. But you're relying on the rape as well. So is that now a fifth? Well, so Your Honor, it's actually larger than that. It's four classes of instances. We have the police as a persecutor. We have the gangs as persecutors. We have her family as a persecutor. That's her mother kicking her out of the house. Is there more than that? Well, she was raped two years every weekend, which the agency would say. But the difficulty with that is that was when she was a child and then ultimately the persecutor was prosecuted for abusing boys. So you're not going to be able to show. I think Nexus is very tough for you on that one because the government did respond. Your Honor, and be that as it may, this is similar to the VTUG versus Holder case where you have a lifetime of systematic abuse. It all gets added into the mix to explain how this woman has to ultimately make the decision to leave. I'm not trying to diminish this person's misery. What I am trying to say is I'm not sure it does all get added into the mix if you can't show Nexus counsels. There's something I'm overlooking there. With the particular rapes when she's a six-year-old, I don't dispute that the record says the person who did it was ultimately arrested. But if you look at her age from six years old until she's 17 and ultimately leaves, she is treated significantly different than anyone else in her household. Okay. All right. I think you've answered the question. So the four classes you're relying on are the police, and there's three episodes of police misconduct that you've identified. Her family. Yes. That's correct. And? The gangs. Oh, the gangs. And then you have economic persecution. All right. Thank you. Your Honor, I'd like to reserve the rest of my time for rebuttal. Good morning. Greg Pennington on behalf of the Attorney General. I'll start by responding to opposing counsel's claims that she was forced into prostitution, which seems to be some of your concern, Judge Kristen. The record shows that she was kicked out of her house in 2011 when she was 17 years old. And then she testified that she went to the capital to Gusagapa, where she finished a college degree in accounting. And then in her declaration, it kind of fills in some of the gaps in her testimony. She says that she looked for months for work as an accountant, but nobody would hire her because of her lack of experience. And this is at the record at 376. So she's not saying there that she was discriminated against on getting a job because of her transgender identity, but because she didn't have any experience. So then she goes and gets the job at the supermarket and is working in prostitution at the same time. So this whole timeline, everything's happening in 2011. So she's working as a prostitute, and then she gets this job at the supermarket where she was fired. So I don't think the record here would compel a conclusion or make a reasonable adjudicator find that she was compelled into slavery or prostitution. But what about, I mean, I'm concerned about the guidance in the manual at Section 4.1 that opposing counsel mentioned. And he's right, it's in his briefing. He's not raising it for the first time today. What about that? I would say he's raising it for the first time in this court. The DHS guidance was not to the immigration judge or to the board on appeal, even though she was counseled in the appeal to the board. And second, that's DHS guidance that's given to asylum officers who are reviewing credible fear proceedings at the border or affirmative asylum applications. She was in proceedings before the Department of Justice. So those guidelines, first, are not binding even on DHS. They're just guidance. And second, they're not binding on the Department of Justice, on the immigration judge that was hearing her case. So sure, and I kind of want to fold in her claim that the IJ failed to consider the evidence in the record and the board failed to consider the evidence in the record. There's no question she submitted a lot of evidence. There's over 200 pages of country condition reports. Mr. Pennington, may I ask you a question that occurred to me? Did the ALJ make a credibility finding? Yes. The immigration judge says she was not sufficiently incredible. She was a sufficiently credible witness. So there wasn't an explicit adverse credibility finding. So the board deemed her testimony as true as this court would too. So what she says is credible testimony, and that's what the court's reviewing. But back to the evidence that she submitted. As this court likes to say, judges and the board, this court, you're not pigs searching for truffles in the ground. She submitted a lot of evidence, but she never pointed to any of it. To the immigration judge, she cited one article where a journalist was murdered. That article, the journalist was not murdered because of transgender or LGBTI status. It was just a journalist that was murdered. And then in her appeal brief to the board, she cited one article out of those hundreds of pages. And in fact, her whole well-founded fear argument was boiled down to one sentence. So that kind of shows where the focus of this case is in this court. It's all past persecution. She really didn't exhaust a well-founded fear claim based on her one sentence that she gave to the board. So then I'll focus on the past the first one. She was working at this, she called the red building. There was, according to her, eight transgender prostitutes and four normal women prostitutes working at the red building. And the police came by and put them all up against the wall and went to search her. And when she resisted, she was forced up against the wall. And then she kept resisting and then and that's when the officer tased her. And this is according to her testimony. So again, under the substantial evidence review, a reasonable adjudicator could find that she was tased because she resisted arrest. She wasn't targeted because she was transgender. They were targeting all the prostitutes, some of which were not transgender. And the second incident was the and I would argue that the 2015 country report states that this is how the police is deplorable, but that's how the police respond to human rights protests, not specifically transgender protests. So they use tear gas, they use violence. It's nothing to show that this one protest was targeted specifically. It's just how they operate. So those two incidents, there's no nexus to her transgender status. And then there's the incidents when she was a child. And all this is just truly unfortunate. I mean, she's had a horrible life, but she does have to show that she's a refugee in order to attain asylum or withholding of removal. And the incidents as a child, she was raped as a six-year-old. There were other children that were victims of this man who was eventually jailed. There's just nothing to show that he abused her because of her transgender identity or that the police were unable or unwilling to control this abuser because they in fact jailed and imprisoned him. Had she come out as transgender at that time? No. She says that she was effeminate and she was teased and harassed at school. She said she committed or attempted to commit suicide when she was nine, but her brother stopped her. But she says she didn't come out as transgender to her mother until she was 17. And that leads to the next incident, her mother who kicked her out of the house and hit her and chipped her tooth. The immigration judge found that this, while it might be connected to her transgender identity, did not rise to the level of persecution. It wasn't sufficiently extreme. And there was no showing that the police were unable or unwilling to control her mother hitting her. And then the last, we've already talked about the police. There was the gang member, Elmer Reyes. Going back to her testimony that she worked at the red building with all these other prostitutes, that was, according to her, Elmer Reyes's territory. And he would charge all of them rent, the transgender prostitutes and the other women that worked there. So she wasn't singled out to pay rent because she was transgender. It was just, she was working on his turf. And then eventually he came out and accused her of being a member, her being a member of a different gang. That was the first threat. She said that Elmer came to me and threatened me because I was a member of another gang. And then he came to her house and again threatened her, accusing her of selling drugs on his territory. There's just no record evidence to compel a conclusion that this was based on her transgender identity. I think a reasonable adjudicator could find that it was not connected to her transgender identity. So those are the four incidents of past persecution she claims. If none of them are connected to a protected ground or shown that the police were unable or unwilling to control, they can't be lumped into a cumulative analysis. Each one has to individually count as persecution in order to be lumped together cumulatively. So even if the court finds that one of them is connected to a protected ground, it would still have to hold that a record, the record compelled a conclusion that that constituted persecution. And as for the Convention Against Torture claim, the immigration judge found that there was no past torture as awful as the past incidents were. None of it was under color of law by a public official that constituted torture. And the immigration judge also found that she could relocate. When she testified as to why she couldn't relocate, she said that she didn't have family or friends where she could go. Is your response to the police response to the LGBT march, that that doesn't constitute persecution on account of this protected status because the police's response to any human rights march is to tase people and beat people up? Well, the tasing was a different incident. That was targeted at the prostitutes that were working. Okay. So the second incident was the human rights march. But you understand my question? I do. Your question seems to be that this doesn't count because the police in this country beat up demonstrators of any sort of any sort of human rights violation. It was quite different to me than to deny that the march was maybe insufficiently specific or diffuse. So they couldn't tell that it was an LGBT march. You seem to be arguing differently that that was an LGBT march. The police responded in the violent way they responded, but that that doesn't establish a cognizable claim for her because the police respond to other human rights marches the same way? Maybe it was inartful, but what I'm trying to get at is that she has to show that the police specifically targeted her or that group because it was LGBT. Well, there's no contention, I don't think, from the government that the police couldn't tell why these people were marching. I heard you say a minute ago is that it doesn't count because the police respond to any kind of human rights march the same way. Is that the government's position? Right. I see your point. And if they are targeting this specific march because it's LGBTI and they harm her, then that would be sufficient to show a link. I'm just saying there's not record evidence to compel a conclusion that they specifically did it on this occasion, that the police formed up because there was a march and she testified that the government approves of these marches. There's no evidence to show that they came out, the police got together and said, let's go harm these members of this march because they're LGBTI. The record is just what? There was a permit or some kind of application to write for this group to have this type of march, this identified type of march, and the police responded the way that it did. And the government's position is you can't tell that's why they responded. Right. We don't know many things about the march. She said that the police were blocking off the streets because they didn't want them to go that way. I mean, we don't know. There could have been, they tried to force their way through and the police responded. There's just not enough evidence in the record to compel a conclusion that the police on this one instance targeted this LGBTI march because it was transgender. They were just performing crowd control. Perhaps. Perhaps. There's just, she would have to point to record evidence to compel a conclusion and the government's position is that she has failed to do that. Is there any evidence in the record that police use different methods for different groups of crowd control? No, there's not. That's why I kind of cited to the 2015 report. Maybe I did it inartfully, but it just seems to be like that's how they respond to crowd control or to protests that get out of hand. There's no evidence that this protest got out of hand? No. No, there's not. And when the evidence is in equipoise, I would say the court would have to defer to the findings of the agency because they have to show that the record will compel an opposite conclusion. Well, doesn't the alien testify that the march was orderly before the police charged them? She does. Does she? Okay, well. Is she credible? She is credible. But even if we get there and the court were to find that that one instance where she was participating in a protest, she did show the nexus, it would still be the government's position that that's insufficient to show past persecution. As this court has held, it's an extreme concept being involved in one beating. So then you would argue on doesn't rise to the level of? Persecution. I believe that's what the immigration judge said about the police instances as well. I see my time's running down. I would kind of finish up on the well-founded fear. We talked about the past persecution. It's the government's position that she just hasn't shown a well-founded fear. And I would go back to what she said to the immigration judge when he asked her, why do you fear going back to Honduras? And she said, because of this gang member, Elmer Reyes, and then because she doesn't want to be another statistic. Another statistics referring to her transgender status. So that's how she presented her well-founded fear claim to the IJ. The IJ says that, well, according to the country reports, there is progress in Honduras. There's laws passed. There's prosecutions for hate crimes. And that, therefore, the government, she hasn't shown the government's unable or unwilling to control her fears of being another statistics because the government is making this progress. And again, to the board, she stated in one sentence that the record shows that she's entitled to a well-founded fear. And that's just insufficient to put the board on notice as to why she think the IJ erred. And it's also insufficient to exhaust it to bring it out before this court. So we would argue that the record does not compel a conclusion that she's suffered past persecution or a well-founded fear. And therefore, this court should deny the petition for review. Thank you. Mr. Palmer. Thank you, Your Honors. I'd like to address a couple of points raised. First, in terms of the transgender rights march, you're exactly right. They did ask her if it was out of control. She said no. She subsequently said, when they asked why it happened, her quote, the trans get beat up because they're trans. The police called them queer when they were organizing the march. That's at record 154. They asked why they broke the march up, because they didn't want the trans women riding together, record 147. There's no dispute that what was happened here, the police knew they were trans women at a transgender rights march. And I think, you know, partly this is explained by the fact that the IJ completely ignored her PSG of a transgender human rights activist. There's no discussion. The government doesn't dispute that at all. And that dovetails really nicely with this clear error. Could you explain to me what you mean by PSG? A particular social group. There's two particular social groups raised here. One is that she's a transgender woman from Honduras. The second is that she's a transgender human rights defender. The government acknowledges it at page five of their brief. The second particular social group here was not addressed by the IJ at all, and the government doesn't dispute that. That alone is sufficient for remand under the line of cases saying that IJ violates the law if it ignores You know, another thing I think is interesting is the government seems to be trying to argue the facts that were deemed credible and are undisputed when it comes to this transgender rights march. And I guess regardless of the fact, it is clear here that everything that happened during that march was both on account of her transgender status and certainly rose to the level of persecution under this court's definition. Physical harm, dislocating arms, using tear gas to violently break up a peaceful rights march certainly rises to the level. And then when you start looking at all the other things that happened to her. But I think his argument was it didn't initially start with the tear gas. They tried to stop it. As I understand the argument, they would stop it. There was resistance to their effort to stop it, and then the tear gas was used. Is that pretty much how it happened? Respectfully, Your Honor, no. There's no evidence in the record at all that there was resistance to the police. The way that the record reads, and this is the credible testimony of the petitioner, is that they were marching. The police wanted to stop it up. Quote, was the march out of hand? No. And then before they know it, they're being violently interdicted by the police. If I could, Your Honor, real briefly address one other thing that the governor raised in their argument. When we're talking about this reasonable fear, there was some suggestion that this was waived. That's the first time we've ever heard that from the government. And in any event, it certainly wasn't. And if we look to the Bromfield case, you can take a reasonable inference. When she says she doesn't want to be another transgender statistic, if the IJ had taken the time to look at the record evidence that she put forth, it's remarkably clear that transgender women bear the brunt of all of the violence and murders that in Honduras. I'll point the court to 511, 378, and 153 of the record just for some of those statistics. But even if we look to the 2015 report that the IJ did look at, it says that 92% of crimes against LGBT individuals aren't even investigated. So if we think about that in context, there's absolutely no way to understand her statement of not wanting to be another transgender statistic other than the fact that she has fear for her life or, at minimum, significant harm. Thank you very much. We're taking you past your time. The case of Mendez versus Barr is submitted. And of course, thanks, counsel, for their argument.
judges: Farris, Bea, Christen